**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 26-cv-26077-JB**

JAMES FISHBACK,

Plaintiff,

v.

ANTHONY RODRIGUEZ, in his individual capacity and official capacity as the Chairman of the Miami-Dade County Commission,

Defendant.
_________________________________/

**DEFENDANTS' MOTION TO DISMISS THE COMPLAINT WITH PREJUDICE AND TO STRIKE DEMAND FOR PUNITIVE DAMAGES**

Plaintiff James Fishback came to the September 1, 2026 meeting of the Miami-Dade Board of County Commissioners ("Board" or "BCC") knowing that public comment was limited to the agenda item before the Board. Indeed, in the opening seconds of his remarks, Fishback assured Chairman Anthony Rodriguez ("Chairman" or "Chairman Rodriguez") that he was "not here to talk about Israel" because he "[did not] want to be escorted out by these great men in uniform." Then he talked about nothing but Israel. Fishback never addressed Item 5(B)—the item before the Board for public hearing, which sought approval of revenue bonds to finance the acquisition of a hospital in Hialeah—and offered no view at all, favorable or unfavorable, on whether the Board should approve it. That is why he was cut off and ultimately removed from chambers, not because he spoke about Israel.

Two days after violating the BCC's Rules of Procedure ("Rules"), Fishback sued, alleging he was censored for criticizing Israel. As the video recording of the meeting makes clear, however,

Fishback was cut off because he spoke off topic, not because of his viewpoint. In fact, other speakers who were critical of the Israeli government—one of them even urging the Board to "divest from apartheid"—***while also*** addressing Item 5(B), spoke in full. Fishback, however, did the one thing speakers had repeatedly been told would end their turn: he ignored Item 5(B) entirely. The rule he broke turns on relevance, not viewpoint: it applies the same way to every speaker who strays from the item before the Board, whatever the topic and whatever the speaker's position. By ending Fishback's turn then, the Chairman enforced a reasonable, viewpoint-neutral restriction in a limited public forum, which the First Amendment permits.

Because Fishback: (1) cannot overcome the Chairman's entitlement to qualified and legislative immunity; (2) fails to plead facts establishing a municipal liability claim; (3) fails to establish subject matter jurisdiction for his claim seeking prospective relief; and (4) filed a shotgun pleading, Miami-Dade County[1] and Chairman Rodriguez move to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Chairman Rodriguez also moves, under Federal Rule of Civil Procedure 12(f), to strike Fishback's demand for punitive damages for failure to plead any facts in support thereof.

## BACKGROUND

### I. The Board's Rules Governing Public Comment

The Board conducts its meetings under rules that govern when and on what matters members of the public may speak. *See* MIAMI-DADE COUNTY CODE § 2-1.[2] "[A]ny citizen shall be

---

[1] Miami-Dade County is not named in the caption of the Complaint, but it is named as a defendant in Counts II and III. Accordingly, Defendants address the counts against the County as well.

[2] The Complaint references all of the following: (1) the Board's official agenda (the "Agenda"), (2) the Rules, (3) Agenda Item 5(B), and (4) Agenda Item 11(A)(2). *See* Compl. ¶¶ 18–22, 24–27, 41, 45–46, & 50. Because Fishback refers to these items in the Complaint, they are central to his claim, and their contents are undisputed, the Court may consider them at the motion-to-dismiss stage under the incorporation-by-reference doctrine. *See Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1276 (11th Cir. 2023). The Court may

entitled to speak on any matter appearing on the official agenda under the section entitled 'Public Hearings.'" Rule 6.02(b) [Ex. 2 at 40]. But no member of the public is entitled "as a matter of right" to address the Board on an agenda item "not scheduled for citizen's presentations or a public hearing." Rule 6.02(c) [*Id.* at 36]; *see also* Rule 6.06(f)–(g) [*Id.* at 39]. Each speaker must register in advance on a card identifying "the public hearing item on which he or she is speaking, and whether he or she is speaking in favor of or against the proposed item," and may not speak on an item for which he is not registered. Rule 6.03(a), (c) [*Id.* at 36]; *accord* Compl. ¶ 22. In short, a registered speaker may be heard for or against the public hearing item for which he registered.

The chairperson, in turn, must "[p]reside at all meetings of the commission and preserve strict order and decorum." Rule 2.01(a)(2)(A) [Ex. 2 at 8–9]. And "[a]ny person making impertinent or slanderous remarks or who becomes boisterous while addressing the Commission shall be barred from further appearance before the Commission by the Presiding Officer," unless a majority of the commissioners present vote to let him continue. Rule 6.05 [*Id.* at 41].

## II. Items 5(B) and 11(A)(2)

Item 5(B) asked the Board to approve the issuance of up to $155 million in revenue bonds to finance the acquisition and renovation of Southern Winds Hospital, an adult inpatient psychiatric facility in Hialeah. Compl. ¶¶ 2, 18–19; *see also* Ex. 3 at 3–4, 7. The financing involved ***no*** County dollars. The bonds were obligations of the Capital Trust Authority and did "not constitute a general obligation, debt or indebtedness of the State of Florida . . . or Miami-Dade County." Ex. 3 at 5; *accord* Compl. ¶ 21 (conceding the bonds "were conduit revenue bonds rather than County

---

also take judicial notice of the documents as public records. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999) (holding that district courts are authorized to take judicial notice of public records at the motion to dismiss stage). These exhibits are attached as follows: the Agenda (***Exhibit 1***), the Rules (***Exhibit 2***), Agenda Item 5(B) (***Exhibit 3***), and Agenda Item 11(A)(2) (***Exhibit 4***).

general-obligation debt"). The only reason Board approval and a public hearing were required was so the bonds could qualify as tax-exempt under federal law. *See* 26 U.S.C. § 147(f)(1), (f)(2)(A)–(B); Ex. 3 at 4–5. The published notice thus invited the public to express views "for or against the proposal to approve the issuance of said Bonds and the nature and location of the Project within the County." Ex. 3 at 8. Accordingly, the BCC's September 1, 2026 agenda listed Item 5(B) under "Public Hearings." *See* Ex. 1 at 16.

Item 11(A)(2) was different. It proposed to amend the County's investment policy to modify the composition of certain authorized investments, including provisions on financial instruments backed by Israel. *See* Ex. 4 at 3–4; Compl. ¶¶ 24–25. The public's opportunity to be heard on Item 11(A)(2) came seven weeks earlier, on July 15, 2026, before the Intergovernmental and Economic Impact Committee, which forwarded the item to the Board with a favorable recommendation. Ex. 1 at 61; Compl. ¶ 27; *see also* Rule 6.06(c) [Ex. 2 at 42] (for a proposition referred to a committee, "the reasonable opportunity to be heard shall be before the committee"). The agenda therefore listed Item 11(A)(2) under "County Commission—Resolutions," which do not include an opportunity to be heard. Ex. 1 at 61; *see also* Rule 6.02(b) [Ex. 2 at 40].

## III. The Public Hearing on Item 5(B)

On September 1, 2026, the Board opened the public hearing on Item 5(B), with Commissioner Danielle Cohen Higgins temporarily presiding. Compl. ¶ 2; *see also* Sept. 1, 2026 BCC Video of Meeting ("Video") at 1:55:54.[3] Registered speakers were called to address the item;[4]

---

[3] Pursuant to the Court's Order Granting Defendants' Motion to Conventionally File a Flash Drive [ECF No. 16], Defendants will be conventionally filing the video. The Court may consider this footage because it is: "(1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). The video is also available on the County's website. *See* Miami-Dade Cnty. Bd. of Cnty. Comm'rs, Meeting Video (Sept. 1, 2026), https://archive-video.granicus.com/miamidade/miamidade_54abcf2b-6ac6-4207-9a33-1a1c86bebf0e.mp4 (last visited Oct. 6, 2026).

[4] For the Court's convenience, ***Exhibit 5*** summarizes each speaker's remarks and the outcome of their turn.

Fishback was not one of them.[5] The first, Jared Simon, criticized what he described as the Board's decision to invest in the unrated debt of the Israeli government and drew applause. *See* Video at 1:57:00–1:58:08. Commissioner Cohen Higgins then addressed the chambers as follows:

> ***5(B) is not the Israeli bonds item. If you start your commentary regarding the Israeli bonds item that already passed as 11A, you will not be permitted to speak, unfortunately***. That item has already passed. Please keep your commentary limited to the item you registered to speak on, which is item 5(B).

*Id.* at 1:58:23–1:58:59.

From there, a pattern held. Speakers who tied their remarks to Item 5(B) were heard in full, whatever their views on Israel. Speakers who abandoned Item 5(B) were not permitted to speak further. The second speaker, Tom Carney, called Item 5(B) an "excellent example" of investing in local bonds that serve the community rather than the "illiquid risky bonds of a foreign government in a volatile region of the world," and urged the Board to consider the people of Palestine in future bond decisions. *Id.* at 1:59:05–1:59:52. He spoke for his full allotted time without interruption. *Id.* at 1:58:59–1:59:52. The third speaker, Eddie Arroyo, announced that he wished to speak on the Israeli bond item that had already passed, Item 11(A)(2). *Id.* at 1:59:56–2:03:15. Commissioner Cohen Higgins responded: "That's not how it works here. Unfortunately, the public hearing on that item has already been opened and closed. . . . ***You need to speak to the item that you registered for. That's what our rules require. We all must follow the same rules***. 5(B) is what you're registered to speak for. Please proceed on 5(B)." *Id.* at 2:00:31–2:00:50. When people began yelling at Mr. Arroyo from the back of the chambers, Commissioner Cohen Higgins asked

[5] The video reflects that Fishback was not among the registered speakers called for Item 5(B). *See* Video at 1:55:54–1:56:57. However, the Complaint alleges that Fishback "timely and properly registered" to speak on Item 5(B). Compl. ¶ 23. For purposes of this motion only, Defendants accept Fishback's allegation.

everyone to take a seat, "keep order in our chambers," and "be respectful of everyone." *Id.* at 2:01:07–2:01:37. Arroyo was permitted to speak in full. *Id.* at 1:59:56–2:03:15.

Chairman Rodriguez then resumed presiding. *Id.* at 2:03:15. When the fourth speaker, Jennifer Harrison, said she wished to speak on Item 11(A)(2), *id.* at 2:03:15–2:03:26, the Chairman ended her turn: "***We need to speak on items that are in public hearing right now. If it's not part of public hearing then it's not something that you speak on***," *id.* at 2:03:54–2:04:23. Endorsing Commissioner Cohen Higgins's earlier remarks, he ***again reminded everyone to "stay on subject" and "stay on the agenda."*** *Id.*

The next two speakers tied their remarks to Item 5(B) and finished without interruption. Rochelle Vargas, speaking on Item 5(B), asked the Board to consider how bond policies are written, to prioritize protecting taxpayer funds over the rate of return, and to keep bonds and investments local rather than invest in foreign governments. *Id.* at 2:04:23–2:05:33. Mina Trachtenberg discussed the safety and liquidity of public funds under Florida law, criticized the Israel-backed instruments authorized by Item 11(A)(2) as high-risk compared to Item 5(B)—which she described as a better example of how to invest public funds—and closed with: "please divest from apartheid." *Id.* at 2:05:40–2:06:14.

The two speakers after them did not stay on Item 5(B). Marcello Valladares said he was addressing Item 5(B) and the County's investment portfolio, but never did, instead turning to the Board's earlier vote permitting "morally bankrupt" investment in a foreign country. *Id.* at 2:06:16–2:06:55. The Chairman cut off his microphone and told him, "Sir, that's not what this item is," and that his time had expired. *Id.* at 2:06:46–2:06:52. Gilan Fandel likewise began by stating she would speak on Item 5(B)—"the investments of this County and where they choose to place our taxpayer dollars"—but when she turned to "the genocide against Palestinians in Gaza at the hands of Israel,"

the Chairman cut off her microphone and ended her turn. *Id.* at 2:06:57–2:07:29. He then stated: "They are not listening. So Sergeants, if they continue, just escort them. Just escort them. Ask them to kindly exit the chamber." *Id.* at 2:07:15–2:07:29.

The ninth speaker, Mohannudd Mohammad, began by saying he was concerned he would be removed from the chamber for being Palestinian and that he wanted to speak on 5(B). *Id.* at 2:07:30–2:07:54. The Chairman responded: "That's not the case. Let's not, let's not put words in anybody's mouth. ***You just have to follow the order and speak on the item . . . you signed up for 5(B), if you speak on 5(B), you can say as much. . . not 11(A)(2) . . . you gotta speak on 5(B). You could speak for your entire minute. Have at it***." *Id.* at 2:07:53–2:08:06. Mohammad then told commissioners that County tax dollars pay their salaries and concluded by stating, "11(A)(2) is an absolute disgrace." *Id.* at 2:08:29–2:08:35. His microphone was cut off, but he continued yelling. *Id.* at 2:08:39–2:08:41.

When Fishback approached the podium, speakers had been warned at least ***six*** separate times to confine their remarks to Item 5(B). Fishback disregarded every one of those warnings, stating:

> Mr. Chairman, I assure you I am not here to talk about Israel. I am not here to talk about the fact that this Commission this morning voted unanimously to give $450 million dollars to the Israeli government. I am not here to talk about the fact that this Commission has struggled to pay the deputies in this County, the teachers in this County, while the fact that the Commission unanimously voted to give up to $450 million dollars of money to Israel. I assure you, I am not talking about that today because I don't want to be escorted out by these great men in uniform. What this is about very simply is whom [*sic*] do you serve? Do you serve the people of Hialeah or of Haifa? Do you serve the people of Aventura or of Tel Aviv?

*Id.* at 2:08:52–2:09:47. The Chairman then cut off his microphone, but Fishback continued, loudly stating: "Do you serve the people of South Miami or of Jerusalem? This money should be invested

here in this community. It should be invested in Miami-Dade County." *Id.* at 2:09:48–2:10:00. The Chairman then directed the sergeants to escort him out. *Id.* at 2:09:49–2:10:00. Despite being repeatedly told his turn was over, and with sergeants approaching, Fishback still kept speaking: "The people here, they deserve better. We need a country that puts America first, not Israel first!" *Id.* at 2:10:00–2:10:11. An audience member then took up the chant, yelling "America first! America first! America first!" *Id.* at 2:10:11–2:10:20.

After Fishback was removed, other commissioners addressed decorum and corrected his claims about Item 11(A)(2). *Id.* at 2:12:00–2:15:50. As Commissioner Gilbert put it: "Our Board today didn't vote to give any money to anyone. We set investment criteria." *Id.* at 2:12:16–2:12:26. Senator Garcia also confirmed that the public had already been given an opportunity to testify about Item 11(A)(2). *Id.* at 2:13:26–2:13:40.

The hearing then resumed. Rachel Prestipino first distanced herself from Fishback's "heinous display," pointed out that he was not recognized or even registered to speak, and added, "I believe he's also running for public office." *Id.* at 2:18:04–2:18:28. She then voiced support for investing in hospitals, affordable housing, and public roads, rather than foreign governments. *Id.* at 2:18:00–2:19:33. The last speaker, Mishka Ahmad, objected to the County's investments in "Israeli bonds which are funding a genocide in Gaza." *Id.* at 2:20:33–2:20:48. With that, her turn ended, and public comment on Item 5(B) concluded. *Id.* at 2:20:55–2:21:00.

## IV. This Lawsuit

On September 3, 2026, two days after violating the Board's rules and being escorted out of the Commission chambers, Fishback filed this lawsuit against Chairman Rodriguez and Miami-Dade County ("Defendants"), alleging that he was silenced "because he referenced and criticized the Israel-bond decision." Compl. at 2. He brings three counts: (1) a First Amendment viewpoint

discrimination claim against Chairman Rodriguez in his individual capacity; (2) a municipal liability claim against the County for First Amendment violation; and (3) a claim for declaratory and injunctive relief against the County and the Chairman in his official capacity.[6] As explained below, each should be dismissed.

## LEGAL STANDARD

For a complaint to withstand a Rule 12(b)(6) motion to dismiss, it "must state a claim for relief that is plausible, not merely possible." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (en banc). A claim is "plausible" if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). In considering a motion to dismiss, a court accepts well-pleaded factual allegations as true and construes them in the light most favorable to the plaintiff, *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 942 F.3d 1215, 1229 (11th Cir. 2019), but does not accept conclusory allegations or legal conclusions, *Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1340 (11th Cir. 2017).

## ARGUMENT

The Complaint is subject to dismissal on several grounds. First, Fishback's claims against Chairman Rodriguez fail as a matter of law because he is entitled to qualified immunity and legislative immunity. Qualified immunity bars Count I because Fishback suffered no constitutional deprivation and there is no law clearly establishing that a public official's enforcement of a subject-

[6] At the outset, the Court should dismiss the official capacity claim against Chairman Rodriguez in Count III as duplicative of the claim against the County in Count III because a suit against an officer in his official capacity "is simply another way of pleading an action against an entity of which an officer is an agent." *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991).

matter limit at a commission meeting violates the First Amendment. As to legislative immunity, the actions Fishback challenges all took place while the Chairman presided over a mandatory public hearing on a pending resolution. He recognized speakers, ruled to keep them on topic, ended Fishback's turn, and directed that he be escorted out of chambers. These are legislative acts, and absolute legislative immunity bars Count I.

Fishback's claims against the County fare no better. For one, the Complaint is devoid of any factual allegations to establish a claim for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), rendering Count II subject to dismissal. And the Court lacks subject matter jurisdiction to grant the prospective relief Fishback seeks in Count III. Finally, the Complaint is a shotgun pleading and should be dismissed for this reason as well.

## I. Chairman Rodriguez is Entitled to Qualified Immunity.

Qualified immunity bars Fishback's claim against Chairman Rodriguez in his individual capacity. First, Fishback suffered no constitutional deprivation. Second, there is no law clearly establishing that a public official's enforcement of a subject-matter limit at a commission meeting violates the First Amendment. Accordingly, Chairman Rodriguez cannot be individually liable.

### A. Qualified Immunity Framework

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Eleventh Circuit has explained that "the 'breathing room' afforded by qualified immunity is generous; . . . 'it protects all but the plainly incompetent or those who knowingly violate the law.'" *Estate of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743

(2011)). Therefore, "[q]ualified immunity . . . represents the rule, rather than the exception," *Sanders v. Howze*, 177 F.3d 1245, 1249 (11th Cir. 1999), and it "shields government actors in all but exceptional cases." *Lassiter v. Ala. A & M Univ., Bd. of Trs.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002).

To avail himself of the qualified-immunity defense, Chairman Rodriguez must first establish that he was acting within the scope of his discretionary authority at the time of the incident. *Brooks v. Miller*, 78 F.4th 1267, 1280 (11th Cir. 2023). This means establishing that his actions were "(1) undertaken pursuant to the performance of [his] duties, and (2) within the scope of [his] authority." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998). Fishback concedes this point by alleging that, "[a]t all material times, Chairman Rodriguez acted under color of state and local law and within the course and scope of his governmental office." Compl. ¶ 17. He also admits that the Chairman had authority to preside at Board meetings and "invoked, purported to invoke, or acted pursuant to that delegated authority when he silenced Fishback and caused his removal." *See id.* ¶¶ 45, 47. Based on these allegations, it is undisputed that Chairman Rodriguez acted within his discretionary authority, which satisfies step one of the qualified immunity analysis.

The burden thus shifts to Fishback to overcome the Chairman's entitlement to qualified immunity. *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). To meet this burden, Fishback must demonstrate that Chairman Rodriguez's conduct "(1) violated federal law (2) that was clearly established at the relevant time." *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021). "[A]n official is entitled to qualified immunity if the plaintiff fails to establish either." *Piazza v. Jefferson County*, 923 F.3d 947, 951 (11th Cir. 2019). Because Fishback cannot meet either prong, Chairman Rodriguez is entitled to qualified immunity and dismissal of Count I.

**B. Fishback Fails to Establish a First Amendment Violation.**

Count I is a First Amendment challenge to a restriction on speech at a public meeting. In this context, forum analysis comes first, because the government's latitude to restrict speech "varies depending on the nature of the forum." *McDonough v. Garcia*, 116 F.4th 1319, 1322 (11th Cir. 2024) (en banc). Fishback concedes that the BCC meeting was a limited public forum. Compl. ¶ 52 (citing *McDonough*, 116 F.4th at 1323). In such a forum, the government "is not required to and does not allow persons to engage in every type of speech[;]" it may reserve the forum "for certain groups or for the discussion of certain topics." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001) (cleaned up). But a restriction "must not discriminate against speech on the basis of viewpoint, and . . . must be reasonable in light of the purpose served by the forum." *Id.* at 106–07 (cleaned up).

Reasonableness is not in dispute here, as Fishback concedes "[t]he First Amendment permitted the Board to confine the hearing to Item 5(B)" and to regulate "irrelevant debate." Compl. ¶¶ 7, 54. That concession is supported by Circuit precedent, which holds that a public meeting "is one forum where speech may be restricted 'to specified subject matter[,]'" and the presiding officer may "regulate irrelevant debate and disruptive behavior." *Rowe v. City of Cocoa*, 358 F.3d 800, 802 (11th Cir. 2004) (quoting *Jones v. Heyman*, 888 F.2d 1328, 1333 (11th Cir. 1989)). The only question, then, is whether the Chairman ended Fishback's remarks because of his viewpoint. The Complaint's allegations and the Video answer that question in the negative.

Viewpoint discrimination is "an egregious form of content discrimination" in which "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). And while content discrimination "may be permissible if it preserves the purposes of that limited forum,"

viewpoint discrimination "is presumed impermissible when directed against speech otherwise within the forum's limitations." *Id.* at 830. Thus, to establish a First Amendment violation, a plaintiff must plead facts supporting a plausible inference that the government official "target[ed] not subject matter, but particular views taken by speakers on a subject." *Id.* at 829. Where the complaint supplies an "obvious alternative explanation" for the challenged conduct, discrimination "is not a plausible conclusion." *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567).

On its face, the Complaint supplies that obvious alternative explanation: Chairman Rodriguez ended Fishback's remarks because "the prior Israel-related item had already passed and [ ] an opportunity had been provided to comment on it." Compl. ¶ 34. The Complaint further acknowledges that "no new public-comment opportunity was provided at the full Board meeting for Item 11(A)(2) because an opportunity to be heard had previously occurred at committee." *Id.* ¶ 27. As the presiding commissioner announced before Fishback even spoke: "If you start your commentary regarding the Israeli bonds item that already passed as 11A, you will not be permitted to speak." Video at 1:58:23–59. But Fishback did just that. He offered commentary on the Israeli bonds item that had already passed—criticizing the Board's purported decision to "give $450 million dollars to the Israeli government"—and so he was cut off. Video at 2:08:55–2:09:47. To be clear, Fishback never mentioned ***anything*** about 5(B): not the hospital, the bonds, or whether the Board should approve the resolution. Nothing.

Similarly, other speakers who lost the floor weren't those who criticized Israel, but those who strayed from Item 5(B) to 11(A)(2). Jennifer Harrison was cut off after attempting to speak about the "egregious nature and fiscal misappropriation of Agenda Item 11(A)(2)." Video at 2:03:15–2:03:25. Marcello Valladares was likewise interrupted when his comments turned from item 5(B) to the Commission's passage of "an item that would allow for further investments in a

foreign country—investments that are already morally bankrupt, wildly unpopular, and should've truly ended long ago." *Id*. at 2:06:34–2:06:42. The same is true of Gilan Fandel, Mohannudd Mohammad, and Mishka Ahmad, who each lost their turn only once they went off topic. *See id.* at 2:07:07–2:07:15 (Fandel, upon mentioning a "genocide against Palestinians in Gaza at the hands of Israel"); 2:08:29–2:08:35 (Mohammad, after remarking that "11(A)(2) is an absolute disgrace"); and 2:20:35–2:20:48 (Ahmad, after claiming "Israeli bonds [ ] are funding a genocide in Gaza."). By contrast, speakers who stayed on Item 5(B) were heard in full, even when they criticized Israel. Tom Carney praised Item 5(B) over the "risky bonds of a foreign government in a volatile region of the world" and urged the Board to consider the people of Palestine in future bond decisions, all without interruption. *Id*. at 1:58:59–1:59:52. So did Mina Trachtenberg, who discussed Item 5(B), criticized Israel bonds as authorized by Item 11(A)(2), and closed with "please divest from apartheid." *Id*. at 2:05:40–2:06:14; *see also id*. at 1:59:56–2:03:15 (Arroyo spoke uninterrupted after being redirected from Item 11(A)(2) to Item 5(B)); 2:04:23–2:05:33 (Vargas spoke uninterrupted about Item 5(B) and keeping investments local); 2:18:04–2:19:33 (Prestipino spoke uninterrupted about investing in hospitals and other public works rather than foreign governments).

At bottom, the Chairman didn't separate critics of Israel from its supporters, which would be viewpoint distinction. He drew the line based on the item that was open for public hearing, Item 5(B), as the Rules require. *See* Rules 6.02(b), (c); 6.03(a); 6.06(f)–(g) [Ex. 2 at 40, 43]. In doing so, he regulated the subject of the discussion, not the speaker's viewpoint. *See Rosenberger*, 515 U.S. at 829–30; *McDonough*, 116 F.4th at 1328–29. And enforcing a subject-matter restriction that Fishback concedes is permissible, *see* Compl. ¶¶ 7, 54, is not viewpoint discrimination. Accordingly, Fishback fails to allege a First Amendment violation, and Count I fails at the first prong of the qualified-immunity analysis.

**C. No Clearly Established Law Prohibited the Chairman's Conduct.**

Additionally, Chairman Rodriguez is entitled to qualified immunity because there is no binding case law that would have put him on notice that, by enforcing the Rules, he would violate the Constitution. Once a government official asserts qualified immunity, the plaintiff bears the burden to show that the law clearly established the unconstitutionality of that official's actions. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). That standard is demanding: the law must be so clear that "every reasonable official would [have understood] that what he is doing violates that right." *Al-Kidd*, 563 U.S. at 741 (cleaned up). Moreover, "the preexisting law must give real notice of practical value to government officials, considering the specific circumstances confronting them, and not just talk of some generalized, abstract intellectual concept." *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002). Rights are clearly established in the Eleventh Circuit pursuant to decisions of the Supreme Court, the Eleventh Circuit, or the Florida Supreme Court. *See Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003).

This Circuit's case law "squarely demonstrates that no clearly established law precluded [the Chairman's] conduct at the time in question." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). To the contrary, it authorizes a presiding officer to confine speakers to the subject at hand. *See Rowe*, 358 F.3d at 803 (acknowledging that "[o]ne recognized way to conduct orderly, efficient meetings . . . is for public bodies . . . to confine their meetings to specified subject matter."). In *Jones v. Heyman*, for instance, the Eleventh Circuit reversed the district court's judgment against a mayor who ended a speaker's remarks and had him removed after he strayed from the agenda item to discuss the commission's general spending habits. 888 F.2d at 1332. Holding that the mayor did not violate the First Amendment, the Court reasoned that denying a presiding officer "the authority to regulate irrelevant debate and disruptive behavior at a public meeting . . . would cause

such meetings to drag on interminably." *Id.* at 1333. Notably, *Jones* reached that result under a more demanding standard than what governs now, treating the commission meeting as a designated public forum in which restrictions were subject to heightened scrutiny. *Id.* at 1331 The Eleventh Circuit has since held that such meetings are limited public forums where restrictions on speech need only be reasonable and viewpoint neutral. *See McDonough*, 116 F.4th at 1328–29. Thus, if *Jones* upheld a subject matter restriction under heightened scrutiny, it can hardly be said that every reasonable official in the Chairman's position would have understood that enforcing one under today's more deferential standard violated clearly established law. Accordingly, Count I also fails under the clearly established prong of the qualified immunity analysis.

## II. Chairman Rodriguez Is Entitled to Absolute Legislative Immunity.

In addition to qualified immunity, Chairman Rodriguez is entitled to legislative immunity. Local legislators are absolutely immune from § 1983 suits arising from their legislative acts. *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998); *see also Woods v. Gamel*, 132 F.3d 1417, 1419 (11th Cir. 1998) ("[C]ounty commissioners can be entitled to legislative immunity when acting in their legislative capacities."). The immunity "attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan*, 523 U.S. at 54 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). And "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id.* at 54. In this Circuit, legislative activity includes "voting, debate and reacting to public opinion," all of which are "manifestly in furtherance of legislative duties." *DeSisto Coll., Inc. v. Line*, 888 F.2d 755, 765 (11th Cir. 1989) (cleaned up).

The Chairman's challenged conduct falls at the core of the legislative sphere. Item 5(B) was a resolution to approve revenue bonds for the benefit of entities associated with Southern Winds Hospital, Compl. ¶ 18, which the Board could adopt only after a duly noticed public hearing.

*Id.* ¶ 20; *see* 26 U.S.C. § 147(f). The September 1, 2026 hearing was held to receive public comment "for or against the proposal to approve the issuance of said [b]onds." Ex. 3 at 8. And as Fishback concedes, the Board's Rules "vested the Chairperson with authority to preside at [the] Board meeting[] and 'preserve strict order and decorum,'" Compl. ¶ 45 (quoting Rule 2.01(a)(2)(A)), including by barring, as Rule 6.05 requires, a speaker who makes "impertinent" remarks. *See* Ex. 2 at 41; *see also* Compl. ¶ 46.

"Several courts have held that moderating the speech and activity of public attendees at a local legislative meeting is legislative activity protected by absolute immunity." *Afjeh v. Vill. of Ottawa Hills*, No. 09-cv-2672, 2010 WL 1795973, at *2 (N.D. Ohio May 5, 2010) (collecting cases). For instance, in *Charnley v. Town of S. Palm Beach*, the court held that "the procedures used by the Council to manage their meetings," among other things, were "clearly within the scope of their legislative functions." No. 13-cv-81203, 2015 WL 12999749, at *5 (S.D. Fla. Mar. 23, 2015), *report and recommendation adopted*, ECF No. 130 (S.D. Fla. Apr. 9, 2015). More specifically, the court found that the mayor's gaveling of a speaker who violated the town's decorum rules was "a permissible act in furtherance of [his] legislative duties." *Id.* (citing *Hogan v. Twp. of Haddon*, 278 F. App'x 98, 104 (3d Cir. 2008)).

Other courts agree, and several have applied legislative immunity to a presiding officer who, like Chairman Rodriguez, either cut off or ejected a speaker. *See, e.g., Cote v. Travis*, No. 23-cv-346, 2025 WL 2052703, at *5–*7 (D.R.I. July 22, 2025) (presiding officer ejected speaker under council rules); *Murray v. City of New Buffalo*, 708 F. Supp. 3d 1313, 1337–38 (W.D. Mich. 2023) (mayor ejected plaintiffs during public comment); *Afjeh*, 2010 WL 1795973, at *2–*3 (councilmen cut off a speaker and refused to let her speak more than one minute); *Timmon v. Wood*, 633 F. Supp. 2d 453, 460 (W.D. Mich. 2008) (council members interrupted and terminated

speaker's commentary); *Carlow v. Mruk*, 425 F. Supp. 2d 225, 236–39 (D.R.I. 2006) (moderator prohibited nonresidents from speaking and removed a member of the public).

As Fishback concedes, "[t]he First Amendment permitted the Board to confine the hearing to Item 5(B)." Compl. ¶ 7. The Board's rules did exactly that, limiting public comment to the item under consideration. *See* Rules 6.02(b)–(c), 6.03(a), (c), & 6.05 [Ex. 2 at 40–41]. Enforcing those rules, Chairman Rodriguez ended Fishback's turn when he addressed a different item (11(A)(2)) rather than the item open for public comment (5(B)). *See* Video at 2:09:49–2:09:58. When Fishback kept speaking, Chairman Rodriguez directed that he be escorted out. *Id.*; Compl. ¶¶ 5, 34–35. In doing so, Chairman Rodriguez fulfilled his duty as chairperson, under the authority conferred by the Board, to "'preserve strict order and decorum'" at the commission meeting. Compl. ¶ 45 (quoting Rule 2.01(a)(2)(A)). And he did so during the public-comment period of a resolution slated to be voted on by the Commission that day. To that end, the Chairman's conduct was part and parcel of the Board's legislative business, entitling the Chairman to legislative immunity. *See Afjeh*, 2010 WL 1795973, at *2.

Finally, Fishback's claim that he was cut off and removed from the meeting because he criticized the Israel-bond decision, Compl. ¶ 3, does not defeat immunity. Because the Chairman's conduct was legislative, he is absolutely immune from suit whatever his motive. *Bogan*, 523 U.S. at 55. In fact, Fishback's theory invites precisely the sort of motive-based inquiry *Bogan* and *Tenney* squarely prohibit. The question is "whether, stripped of all considerations of intent and motive, [the] actions were legislative." *Id.* And a "claim of an unworthy purpose does not destroy the privilege," *Tenney*, 341 U.S. at 377, even where, as in *Tenney*, the plaintiff alleges that legislators acted intentionally to silence his speech, *id.* at 371. *See also Woods*, 132 F.3d at 1419

n.4 ("Even if the commissioners acted out of evil intent, the legislative nature of the act still controls.").

As one Fourth Circuit judge put it, "[e]very presiding official in a public meeting must, at some time, make a spontaneous judgment as to whether a speaker is abusing the forum." *Collinson v. Gott*, 895 F.2d 994, 1005 (4th Cir. 1990) (Wilkinson, J., concurring). Chairman Rodriguez did just that. Stripping the Complaint of its conclusory, motive-based allegations, what remains is a claim that the Chairman did exactly what the Board's rules required him to do: confine public comment to the item under consideration and maintain order when a speaker refuses to yield. Legislative immunity therefore bars Count I.

**III. Count II Fails to State a Claim for Municipal Liability Against the County.**

In Count II, Fishback brings a municipal liability claim against Miami-Dade County for alleged First Amendment violations. Compl. ¶¶ 68–75. But because Fishback does not plausibly allege a constitutional violation, *see supra* § I(B), any challenge to the County's policies is "quite beside the point," requiring dismissal of this claim. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Sampson v. City of Brunswick*, 549 F. App'x 858, 861 (11th Cir. 2013) ("In this case, the City and County cannot be liable because, as we've already discussed, we've identified no violation of the plaintiffs' constitutional rights by the individual Defendants."). That alone requires dismissal of Count II.

But even if Fishback had alleged a violation of his constitutional rights—which he hasn't—the claim against the County would still fail. A local government cannot be held liable under § 1983 for the acts of an elected official merely because the municipality employs that official. *Monell*, 436 U.S. at 691 ("a municipality cannot be held liable under § 1983 on a respondeat superior theory."). In other words, "[a] county's liability under § 1983 may not be based on the doctrine of respondeat superior." *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc); *see*

*also Skop v. City of Atlanta*, 485 F.3d 1130, 1145 (11th Cir. 2007) ("it is by now axiomatic that in order to be held liable for a § 1983 violation, a municipality must be found to have *itself* caused the constitutional violation at issue; it cannot be found liable on a vicarious liability theory."). Therefore, a plaintiff has two methods to establish municipal liability: "identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice[] of the county shown through the repeated acts of a final policymaker for the county."[7] *Grech*, 335 F.3d at 1329.

Here, Fishback concedes that the First Amendment "permitted the Board to confine the hearing to Item 5(B)," Compl. ¶ 7, and to "enforce reasonable viewpoint-neutral rules governing time, decorum, and germaneness." *Id.* at 2. At the same time, he contends that Chairman Rodriguez was the "authorized decisionmaker" for the County regarding management of the BCC meeting, and that his "decision" constituted an unconstitutional County "policy." *Id.* ¶ 71. Fishback does not specify which "decision" amounts to a County "policy" of violating the Constitution. And the only rules bearing on Fishback's removal from the chambers are the BCC Rules, which confine public commentary to the item open for discussion and which bar "impertinent or slanderous remarks." *See* Rules 6.02(b)–(c), 6.05 [Ex. 2 at 40–41]. Fishback does not challenge the constitutionality of these Rules; he challenges ***how*** the Rules were applied to him on September 1, 2026. Compl. ¶¶ 71–73.

But that reframing doesn't help him: a challenge to a single decision by an official can give rise to municipal liability only when it is made by an official who possesses final policymaking authority for the municipality. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–83 (1986). Analyzing the contours of such a claim, the Supreme Court has emphasized that:

---

[7] Fishback does not allege the County had a custom of violating the First Amendment—nor does he identify any instance outside of his own experience to support such an allegation—so this aspect of *Monell* liability is not at issue in this case.

> [N]ot every decision by municipal officers automatically subjects the municipality to § 1983 liability. Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. ***The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion***.

*Id.* at 481–82 (emphasis added). Liability attaches "where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483; *see also Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002) ("only those municipal officers who have final policymaking authority may by their actions subject the government to § 1983 liability.") (cleaned up). The Chairman is no such official.

"[W]hether an official ha[s] final policymaking authority is a question of state law." *Pembaur*, 475 U.S. at 483. "Where a policymaker is a public body consisting of multiple board members, a majority of the members of the council constitutes a final policymaker for purposes of creating *Monell* liability." *O'Boyle v. Sweetapple*, 187 F. Supp. 3d 1365, 1372 (S.D. Fla. 2016) (cleaned up). Here, policymaking authority rests with the entire thirteen-member Board acting as a governing body by majority vote. *See* Miami-Dade County Home Rule Charter § 1.01(A) ("The Board of County Commissioners shall be the legislative and the governing body of the county."); Rule 5.03 [Ex. 2 at 23] ("No ordinance, resolution or motion shall be adopted by the commission without the affirmative vote of the majority of all the members present."). Therefore, "the County can be subject to liability only if the Commission itself acted with an unconstitutional motive." *Matthews*, 294 F.3d at 1297; *see also Rosario v. Miami-Dade County*, 490 F. Supp. 2d 1213, 1222 (S.D. Fla. 2007) ("final policymaking authority for Miami-Dade County rests with the Board of County Commissioners or the City Manager") (cleaned up). The Commission did not act here;

only one member did. Because the Chairman did not have final decision-making authority, he cannot subject the County to municipal liability.

Perhaps in recognition of this hurdle, the Complaint goes one step further, suggesting that the Board "ratified" the Chairman's decision to end Fishback's speaking turn by "observ[ing]" it. Compl. ¶¶ 49, 72. But the Eleventh Circuit has foreclosed that avenue too. In *Matthews*, a five-member county commission voted to eliminate the plaintiff's position, and she argued that the commission had ratified one commissioner's retaliatory motive because the others knew of it, were influenced by him, and regularly voted with him. 294 F.3d at 1296–97. The Eleventh Circuit rejected that theory, holding that "the final policymaker . . . must ratify not only the decision itself, but also the unconstitutional basis for it." *Id.* at 1297. Because only one commissioner acted with an unconstitutional motive, the County could not be held liable. *Id.* at 1298.

Fishback's ratification theory is weaker still. He does not allege that any commissioner approved the Chairman's ruling, much less the viewpoint-based motive he ascribes to it. He alleges only that the commissioners present "observed" the removal, "did not grant Fishback permission to continue," and "allowed" the ruling to stand as the Board's disposition of his speaking turn. Compl. ¶¶ 49, 72. Stripped of characterization, all that is alleged is that the Board did nothing. Doing nothing is not approval of a decision, and it is certainly not approval of "the unconstitutional basis for it." *Matthews*, 294 F.3d at 1297; *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality) ("If the ***authorized policymakers*** approve a subordinate's decision ***and the basis for it***, their ratification would be chargeable to the municipality because their decision is final.") (emphasis added). What Fishback calls ratification is nothing more than silence. But if silence were enough, every unreviewed ruling by every County official could be classified as an act of the County, which is exactly the kind of vicarious liability *Monell* forbids.

Fishback cannot save this claim by pitching the policy at a higher level of generality—suggesting, without any factual support, that the County has a policy of silencing "disfavored viewpoint[s]" concerning Israel. Compl. ¶ 73. That characterization is flatly refuted by the recording of the meeting, which shows speakers who criticized Israel in the context of Item 5(B) were permitted to speak fully. *See, e.g.*, Video at 1:59:05–1:59:52; 2:04:23–2:05:33; 2:05:40–2:06:13. A policy of suppressing certain viewpoints, of course, would not permit that viewpoint to be repeatedly expressed.

What remains then is a challenge to one ruling by one presiding officer on one item. That's not enough to subject the County to municipal liability under 42 U.S.C. § 1983. Because Fishback has not plausibly alleged that Miami-Dade County has a policy of violating the First Amendment, the County is entitled to dismissal of Count II with prejudice.[8]

## IV. Count III Must Be Dismissed Because the Court Lacks Subject Matter Jurisdiction.

In Count III, Fishback seeks declaratory and prospective relief by requesting that the Court: (1) declare that the County violated the First Amendment by cutting his microphone off and removing him from chambers on September 1, 2026, and (2) prohibit the County "from treating his Israel-bond criticism as categorically irrelevant when it forms part of a reasonably related argument on a future County bond, investment, or financial-policy item." Compl. ¶¶ 79–80. The Court lacks jurisdiction to grant either.

---

[8] To the extent Fishback seeks discovery to substantiate his municipal liability claims, *see* Compl. ¶ 51, that approach is misguided. *See Carter v. DeKalb Cnty., Ga.*, 521 F. App'x 725, 729 (11th Cir. 2013) ("as we've already said…discovery follows a well-pleaded complaint, not the other way around."); *see also Venisee v. Miami-Dade Cnty.,* No. 25-20024, 2025 WL 1529683, at *9 (S.D. Fla. May 29, 2025) (finding that a plaintiff "can't simply allege that the County has an unconstitutional policy or custom and then hope that discovery will later substantiate his claim."); *Sovereign Bonds Exch. LLC v. Fed. Republic of Ger.*, No. 10-21944, 2011 WL 13100214, at *2 (S.D. Fla. Aug. 9, 2011) (Altonaga, J.) ("Parties may not file insufficient complaints with the hope of receiving discovery to make them sufficient.").

Article III limits this Court's jurisdiction to actual cases and controversies, and the Declaratory Judgment Act imposes that same limit. *Emory v. Peeler*, 756 F.2d 1547, 1551–52 (11th Cir. 1985). To establish standing, a plaintiff must allege an injury in fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Where the relief sought is prospective, as it is here, establishing an injury in fact requires a plaintiff to "allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999); *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) ("[B]ecause the plaintiffs request forward-looking relief, they must face a real and immediate threat of repeated injury."). In other words, "there must be a substantial continuing controversy between parties having adverse legal interests," and the "plaintiff must allege facts from which the continuation of the dispute may be reasonably inferred." *Emory*, 756 F.2d at 1552. Importantly, that "continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." *Id*. "The remote possibility that a future injury may happen is not sufficient to satisfy the actual controversy requirement for declaratory judgments." *Id.* (cleaned up); *see also Malowney*, 193 F.3d at 1347 ("a perhaps or maybe chance is not enough") (cleaned up).

At the pleading stage, "a prayer for injunctive and declaratory relief requires an assessment. . . of whether the plaintiff has sufficiently shown a real and immediate threat of future harm." *Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006). The future injury must be "imminent and concrete enough for judicial consideration," *id.*, which means "allegations of *possible* future injury are not sufficient," and a plaintiff must "demonstrate that future injury is *certainly impending*, or at the very least, that there is *a substantial risk* that the harm will occur." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, 115 F.4th 1266, 1281–82 (11th Cir. 2024) (cleaned up). The

Complaint fails to meet this standard.

First, Fishback's request for a declaration that the County violated the First Amendment on September 1, 2026, would be "nothing more than a gratuitous comment without any force or effect." *Malowney*, 193 F.3d at 1348 (cleaned up). Declaratory relief is forward-looking: it exists to define the parties' rights so that they may conform their future conduct. *See id.* at 1347–48. A declaration that the County violated the First Amendment at a meeting that has already ended would not alter the parties' legal relationship, undo what happened, or require anyone to do or refrain from doing anything. Therefore, that request does not present a live controversy and should not proceed. *See, e.g.*, *Creedle v. Miami-Dade County*, 349 F. Supp. 3d 1276, 1292 (S.D. Fla. 2018) (Williams, J.) (denying request for declaratory relief relating to past conduct as moot); *Cohen v. U.S. Dep't of Homeland Sec.*, No. 24-24368, 2026 WL 717176, at *8 (S.D. Fla. Feb. 2, 2026), *report and recommendation adopted*, No. 24-24368, 2026 WL 714564 (S.D. Fla. Mar. 13, 2026) (same); *Donovan v. Rivadeneira*, 557 F. Supp. 3d 1236, 1243 (S.D. Fla. 2021) (Altonaga, C.J.) (noting that the plaintiffs' past injury was "of no consequence given that an injury in the past does not support a finding of an Article III case or controversy[.]") (cleaned up).

What remains is Fishback's claim that "[a]n actual controversy exists concerning whether Defendants may silence or remove Fishback from future Board meetings when he presents a germane comparative argument criticizing the County's Israel-bond investment policy as part of his comments on County bond or financial matters." Compl. ¶ 77. But the controversy he describes is purely hypothetical. Even a cursory review of the BCC meeting shows Fishback never presented a "germane" argument regarding Item 5(B)—not a word about the hospital, the bonds, or the project. *See* Video at 2:08:52–2:10:11. The injury he asks this Court to enjoin therefore depends on conduct he has yet to engage in, on a ruling the Chairman never made, on matters not yet before

the Board, which Fishback fails to describe with any specificity. That is precisely the speculative threat of future injury that cannot support prospective relief.

On this point, the Eleventh Circuit's decision in *Elend* is instructive. The plaintiffs there were removed while attempting to protest at a presidential appearance at the University of South Florida Sun Dome, and they sought an injunction against future removals. 471 F.3d at 1202–05. To establish standing for that relief, they alleged that they would "peacefully express their viewpoints in the future in a manner similar to their activities on November 2, 2002 in concert with presidential appearances at the USF Sun Dome and at other locations around the country." *Id.* at 1204. The Eleventh Circuit held that allegation insufficient. Because the plaintiffs identified no particular event, time, place, audience, or manner of protest, their stated intentions amounted to the "some day" intentions the Supreme Court rejected in *Lujan*, and could not establish the "actual or imminent" injury Article III demands. *Id.* at 1207–08 (quoting *Lujan*, 504 U.S. at 564).

Fishback's allegation is the same in substance and weaker on the facts. He identifies no particular item on any particular agenda, only "future Board meetings addressing County bond, investment, or financial-policy matters." Compl. ¶ 78; *see also id.* ¶ 44. And unlike the *Elend* plaintiffs, who at least pointed to conduct they had actually engaged in, Fishback asks this Court to enjoin a response to conduct he never engaged in: a germane argument on the item before the Board. An injury that depends on two layers of speculation—what Fishback may someday say, and how the presiding officer may someday respond—is not the real and immediate threat Article III requires. *See, e.g.*, *City of Los Angeles v. Lyons,* 461 U.S. 95, 105 (1983) (where a plaintiff seeks prospective relief, he must demonstrate a "real and immediate threat" of future injury); *Johnson v. Bd. of Regents,* 263 F.3d 1234, 1265 (11th Cir. 2001) (same); *Wooden v. Bd. of Regents,* 247 F.3d 1262, 1284 (11th Cir. 2001) (same); *Elend*, 471 F.3d at 1207 ("[t]he binding precedent in

this circuit is clear that for an injury to suffice for prospective relief, it must be imminent."); *see also Donovan*, 557 F. Supp. 3d at 1245 ("[p]laintiffs do not demonstrate that they are faced with any immediate threat of injury, as required to satisfy the injury in fact requirement of standing.").

Separately, and in any event, Count III is not a claim at all. "An injunction is a remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed—if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005) (cleaned up). Here, the Video shows the Chairman enforced a subject-matter limit which Fishback concedes the First Amendment permits. *See supra* § I(B). Therefore, Fishback pleads no plausible independent right that was infringed thus precluding the prospective relief he seeks.

In sum, Fishback asks this Court to declare the past unlawful and to proscribe the future on an assumption that he will one day do what he didn't do on September 1, 2026—address the item before the Board. Article III permits neither. Because Fishback pleads only an alleged past injury and a hypothetical intention to speak again, Count III should be dismissed for lack of subject matter jurisdiction.

**V. The Complaint is a Shotgun Pleading.**

Independent of the foregoing, the Complaint is an impermissible shotgun pleading. The Eleventh Circuit has long condemned a complaint "where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015). The Complaint does just that. Count II, against the County, "realleges paragraphs 1 through 67," sweeping in every allegation of Count I against the Chairman individually. Compl. ¶ 68. And then Count III "realleges paragraphs 1 through 75," incorporating

***both*** prior counts against different defendants under different theories. *Id.* ¶ 76. Defendants and the Court are thus left to guess at which allegations support which claims against which defendant. *See Weiland*, 792 F.3d at 1323. The Complaint should be dismissed on this basis as well.

**VI. The Court Must Strike Fishback's Demand for Punitive Damages.**

Finally, and although the Complaint is subject to dismissal outright for all of the reasons discussed *supra*, the Court should strike Fishback's demand for punitive damages against Chairman Rodriguez in his individual capacity. *See* Compl. ¶¶ 8, 65. The Complaint alleges no facts whatsoever to support such an award, and the demand therefore fails as a matter of law.

In a § 1983 action, punitive damages may only be awarded where the plaintiff pleads and shows on the part of the defendant "reckless or callous disregard for the plaintiff's rights as well as intentional violations of federal law[.]" *Smith v. Wade*, 461 U.S. 30, 51 (1983). As a pleading matter, therefore, a demand for punitive damages requires allegations of "wanton, willful or outrageous conduct." *Simmons v. Royal Caribbean Cruises, Ltd.*, 423 F. Supp. 3d 1350, 1352 (S.D. Fla. 2019). Absent such allegations, a demand for punitive damages "must be stricken." *Id.*

Fishback falls far short from meeting this pleading standard. Rather, he reiterates the standard for punitive damages, and simply concludes that Chairman Rodriguez "acted intentionally, recklessly, and with callous disregard for Fishback's federally protected rights." Compl. ¶ 65. Offering nothing more, he fails to support these unadorned legal conclusions with any factual allegations. Fishback fails to allege any "wanton, willful or outrageous conduct" on the part of Chairman Rodriguez. *Simmons*, 423 F. Supp. 3d at 1352. And "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Accordingly, Fishback's demand for punitive damages must be stricken.

Dated: October 6, 2026

Respectfully submitted,

**GERALDINE BONZON-KEENAN**
Miami-Dade County Attorney

By: *<u>/s/ Jennifer L. Hochstadt</u>*
Jennifer L. Hochstadt
E-mail: jennifer.azar@miamidade.gov
Florida Bar No. 56035
Fabiana Cohen
E-mail: cohenf@miamidade.gov
Florida Bar No. 119732
Assistant County Attorneys
Miami-Dade County Attorney's Office
Stephen P. Clark Center
111 N.W. First Street, Suite 2810
Miami, Florida 33128
Telephone: (305) 375-5151
Facsimile: (305) 375-5611
*Counsel for Defendants*