**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:26-cv-26077-JB**

JAMES FISHBACK,
Plaintiff,

v.

ANTHONY RODRIGUEZ, in his individual capacity and official capacity as Chairman of the Miami-Dade County Commission,

Defendant.
_____________________________________/

**<u>RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION</u>**

Defendant Anthony Rodriguez, in his official capacity as Chairman of the Miami-Dade County Commission,[1] responds to Plaintiff James Fishback's Verified Motion for Preliminary Injunction ("Motion") [ECF No. 5].

## INTRODUCTION

On September 1, 2026, the Miami-Dade Board of County Commissioners ("BCC" or "Board") held a public hearing on Item 5(B), a resolution approving the Capital Trust Authority's issuance of revenue bonds for a psychiatric hospital in Hialeah. Earlier in the meeting, the Board had adopted Item 11(A)(2), a separate resolution amending the County's investment policy, including its treatment of Israel bonds. Unlike Item 5(B), Item 11(A)(2) was not open for public comment. The presiding officers therefore told the chamber at least six times to confine their

[1] As set forth in the Motion to Dismiss, Fishback's claims against Chairman Rodriguez in his official capacity are actually claims against Miami-Dade County. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("[S]uits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent."). As such, this Response refers to Chairman Rodriguez in his official capacity as "the County."

remarks to Item 5(B). Speakers who did so were heard in full, even when they sharply criticized the Israel-bond investment. Speakers who abandoned Item 5(B) to relitigate Item 11(A)(2) altogether lost the floor. Fishback did the latter. After assuring the Chairman he was "not here to talk about Israel" because he did not "want to be escorted out," Fishback talked about nothing else and never once mentioned Item 5(B). When the Chairman cut his microphone, Fishback continued, shouting, "We need a country that puts America first, not Israel first!" Two days later, he sued.

Now, Fishback asks this Court to enjoin the County from engaging in viewpoint discrimination. *See* Mot. at 14. In other words, he wants this Court to order the County to obey the First Amendment. But "an injunction demanding that a party do nothing more specific than 'obey the law' is impermissible." *Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006). The Motion should be denied because it fails every prerequisite for injunctive relief. First, Fishback has no standing to seek prospective relief because he has not shown a substantial risk that future harm will occur. Second, Fishback has not shown substantial likelihood of success on the merits. As set forth in Defendants' Motion to Dismiss [ECF No. 17], the Complaint [ECF No. 1] fails to state a First Amendment claim at all. The Chairman enforced a viewpoint-neutral, subject-matter restriction in a limited public forum, which the First Amendment permits. The absence of an underlying constitutional violation is dispositive, defeating every claim against both the Chairman and the County. But even if Fishback had stated a constitutional claim, legislative and qualified immunity would independently bar his suit against the Chairman. Because Fishback cannot show a substantial likelihood of success on the merits, the Motion fails on that basis alone. *See Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011) ("If [the plaintiff] is unable to show a substantial likelihood of success on the merits, we need not consider the other requirements.").

Should the Court look beyond these two threshold issues, though, Fishback fares no better on any of the remaining prongs. He cannot show irreparable harm because there is no ongoing threat of future injury, and any past injury he claims can be remedied with damages at law. Moreover, the balance of harms weighs against an injunction that would hang the threat of contempt over every ruling on Fishback's remarks at every future BCC meeting. And the public interest favors orderly BCC hearings governed by the rules, not a special exemption granting one speaker the unfettered right to be heard on any topic at any time. Because the record evidence resolves every material fact, the Motion should be denied without an evidentiary hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

The full record of the September 1, 2026 BCC meeting is detailed in Defendants' Motion to Dismiss [ECF No. 17] (the "MTD") and supported by the official video recording (the "Video"), which Defendants have moved to file conventionally, *see* [ECF No. 15]. Defendants summarize the relevant facts below.

### I. The Board Confines Public Comment to the Item Under Consideration.

The BCC's Rules of Procedure define who may speak on what topic and when. Under Rule 6.02, any citizen may speak on any matter listed under the "Public Hearings" section of the official agenda, but no member of the public shall be entitled to address the Board "as a matter of right" on an item not scheduled for a public hearing. *See* September 1, 2026 Agenda [ECF No. 17-1 at 14–31]; Rule 6.02(b)–(c) [ECF No. 17-2 at 39–40]. Furthermore, each speaker must register for a specific public hearing item and may not speak on an item for which he is not registered. Rule 6.03(a), (c) [ECF No. 17-2 at 40]; *accord* Compl. ¶ 22. Fishback concedes the First Amendment "permitted Defendants to enforce reasonable, viewpoint-neutral rules governing time, decorum,

and germaneness[.]" Compl. at 2; *see also id.* ¶ 54 (admitting the government may confine a public meeting to specified subject matter).

Item 5(B) asked the Board to approve the issuance of up to $155 million in revenue bonds to finance the acquisition and renovation of Southern Winds Hospital, an adult inpatient psychiatric facility in Hialeah. *See* Item 5(B) [ECF No. 17-3 at 3–4, 7]; Compl. ¶¶ 2, 18–19. Notably, the financing involved no County dollars. [ECF No. 17-3 at 5] (explaining the bonds "shall not constitute a general obligation, debt or indebtedness of . . . Miami-Dade County"). Rather, Board approval and a public hearing were required so the bonds could qualify as tax-exempt under federal law. *See* 26 U.S.C. § 147(f)(1), (f)(2)(A)–(B); [ECF No. 17-3 at 5]. Accordingly, the published notice invited the public to express views "for or against the proposal to approve the issuance of said Bonds and the nature and location of the Project within the County." [ECF No. 17-3 at 8]. For that reason, the BCC's September 1, 2026 agenda listed Item 5(B) under "Public Hearings." *See* [ECF No. 17-1 at 16].

Item 11(A)(2) was different. It amended the composition of the County's investment policy to conform to changes in state law, allowing for investment in bonds, notes, or instruments backed by the full faith and credit of the Israeli government. *See* Item 11(A)(2) [ECF No. 17-4 at 3–4]. Unlike Item 5(B), which was scheduled for public hearing at the September 1 BCC meeting, Item 11(A)(2) had its public hearing weeks earlier, on July 15, 2026. *Id.* at 1; *see also* Compl. ¶ 27. That's why Item 11(A)(2) was listed under "County Commission—Resolutions" in the agenda, along with other items that did not have an opportunity to be heard. [ECF No. 17-1 at 61]. The Board considered and approved Item 11(A)(2) earlier in the meeting, before the Public Hearing items were opened for discussion.

## II. The Presiding Officers Repeatedly Explained the Rule, and Applied it Evenly.

The public hearing on Item 5(B) opened with Commissioner Danielle Cohen Higgins temporarily presiding. Video at 1:55:54. Ten registered speakers were called; Fishback was not among them. *Id.* at 1:55:54–1:56:25.[2] The first speaker, Jared Simon, criticized what he described as the Board's decision to invest in unrated Israeli government debt. *Id.* at 1:57:00–1:58:08. Commissioner Cohen Higgins then announced the governing rule as follows: "5(B) is not the Israeli bonds item. If you start your commentary regarding the Israeli bonds item that already passed as 11A, you will not be permitted to speak, unfortunately. . . . Please keep your commentary limited to the item you registered to speak on, which is item 5(B)." *Id.* at 1:58:26–1:58:59. When the third speaker, Eddie Arroyo, said he wished to speak on Item 11(A)(2), Commissioner Cohen Higgins reminded him "5(B) is what you're registered to speak for. Please proceed on 5(B)." *Id.* at 2:00:31–2:00:50. Arroyo did, and he spoke in full. *Id.*

Chairman Rodriguez then resumed presiding. When Jennifer Harrison said she wished to speak on Item 11(A)(2), he ended her turn and reiterated the rules for the third time. *See id.* at 2:03:54–2:04:23 ("We need to speak on items that are in public hearing right now. If it's not part of public hearing then it's not something that you speak on."). He also reminded the public to "stay on subject" and "stay on the agenda." *Id.* After cutting off two more speakers who turned from Item 5(B) to Item 11(A)(2), the Chairman defined the rules once more, making it abundantly clear: "You just have to follow the order and speak on the item . . . you signed up for 5(B), if you speak

[2] Fishback verifies he "timely and properly registered to speak on Item 5(B)." Mot. at 4. The recording shows he was not among the ten speakers called, Video at 1:55:54–1:56:25, and a later speaker stated on the record that he was neither recognized nor registered, *id.* at 2:18:10–2:18:28. Defendants accepted Fishback's allegation that he properly registered to speak on Item 5(B) for purposes of the MTD only. *See* [ECF No. 17 at 5 n.5]. But, at this juncture, Fishback's failure to properly register should go to the weight the Court gives to his Motion's verification.

on 5(B), you can say as much. . . . Not 11(A)(2), you gotta speak on 5(B). You could speak for your entire minute. Have at it." *Id.* at 2:07:53–2:08:06.

The rule was applied the same way to every speaker. Those who tied their remarks to Item 5(B) were heard in full, regardless of their opinions on Israel. *See, e.g.*, *id.* at 1:58:59–1:59:52 (Tom Carney calling Item 5(B) an "excellent example" of local investment compared with the "risky bonds of a foreign government in a volatile region of the world," and urging the Board to consider the people of Palestine); 2:04:23–2:05:33 (Rochelle Vargas, speaking on Item 5(B), urging the Board to keep bonds and investments local rather than invest in foreign governments); 2:05:40–2:06:14 (Mina Trachtenberg criticizing the Israel-backed instruments as high-risk compared to Item 5(B) and closing with "please divest from apartheid."). By contrast, the speakers who disregarded Item 5(B) and chose to speak on Item 11(A)(2) instead lost the floor. *See id.* at 2:03:15–2:03:51 (Harrison); 2:06:16–2:06:55 (Valladares); 2:06:57–2:07:29 (Fandel); 2:07:38–2:08:41 (Mohammad); *see also* [ECF No. 17-5] (summarizing each speaker's remarks and the Board's response).

**III. Fishback Ignored the Rule and Refused to Yield.**

By the time Fishback reached the podium, speakers had been told at least six times to confine their remarks to Item 5(B). Ignoring those instructions, he devoted his remarks to Item 11(A)(2):

> Mr. Chairman, I assure you I am not here to talk about Israel. I am not here to talk about the fact that this Commission this morning voted unanimously to give $450 million dollars to the Israeli government. I am not here to talk about the fact that this Commission has struggled to pay the deputies in this County, the teachers in this County, while the fact that the Commission unanimously voted to give up to $450 million dollars of money to Israel. I assure you, I am not talking about that today because I don't want to be escorted out by these great men in uniform. What this is about very simply is whom [*sic*] do you serve? Do you serve the people of Hialeah or of Haifa? Do you serve the people of Aventura or of Tel Aviv?

Video at 2:08:52–2:09:49. With that, the Chairman cut off his microphone, but Fishback continued: "[D]o you serve the people of South Miami or of Jerusalem? This money should be invested here in this community." *Id.* at 2:09:48–2:09:58. Only then did the Chairman direct the sergeants to "take him out." *Id.* at 2:09:50–2:10:00. Fishback never mentioned Item 5(B) at all, nor did he ever—as he now claims—"contrast[] the local hospital financing proposal then before the Commission" with the Board's "Israel-bond investment-policy decision." Mot. at 5. Though repeatedly told his turn was over, and with sergeants approaching, Fishback kept speaking off topic: "We need a country that puts America first, not Israel first!" Video at 2:10:00–2:10:11. An audience member then took up the chant, yelling "America first!" *Id.*

None of this appears in Fishback's verified Motion. The Motion quotes only two statements—***both spoken after his microphone had already been cut off***—and presents them as the argument he made before the Chairman acted. Mot. at 2, 4 (stating "do you serve the people of South Miami or of Jerusalem" and "this money should be invested here in this community."). On that basis, Fishback describes his remarks as a "comparative financial-policy argument" bearing "a reasonable relationship to the subject of Item 5(B)," *id.* at 4–5, and swears he did not "shout[ ] over the Commission, . . . refuse[] repeated neutral directions concerning the manner of his presentation, or otherwise cause[] a material disruption." *Id.* at 6. The recording shows the exact opposite. Fishback never made any sort of comparative financial argument. He stood there, ignored the Chairman's repeated warnings to stay on Item 5(B), and spoke exclusively on Item 11(A)(2) until his microphone was cut off.

**IV. Fishback Sues and Moves for a Preliminary Injunction.**

Two days after the BCC meeting, Fishback sued Chairman Rodriguez and the County, alleging he was silenced "because he referenced and criticized the Israel-bond decision." Compl.

at 2. Subsequently, he filed this Motion, seeking to enjoin the County from precluding him from doing something he has not yet done: make germane comments that are "reasonably related" to an item before the Board. *See* Mot. at 10 (seeking an order "prohibiting Chairman Rodriguez from treating criticism of the County's Israel-bond investment policy as categorically irrelevant when that criticism forms part of a reasonably related argument concerning a County bond, investment, budget, or financial-policy matter open for public comment."). Defendants moved to dismiss the Complaint in its entirety.

## LEGAL STANDARD

A plaintiff is entitled to a preliminary injunction only when he can "clearly establish the following requirements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018) (cleaned up). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four prerequisites." *Id.* at 1288 (cleaned up). And when a plaintiff seeks to enjoin a government entity, it "must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs." *Rizzo v. Goode*, 423 U.S. 362, 378–79 (1976) (cleaned up).

## ARGUMENT

### I. Fishback Does Not Have Standing to Seek Prospective Relief, Which Alone Requires Denial of the Motion for Preliminary Injunction.

At the preliminary injunction stage, a plaintiff must make "a clear showing" that he is "likely" to establish each element of standing. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). Standing is a threshold jurisdictional question. Without it, a federal court lacks subject matter

jurisdiction to award the relief requested, and it must resolve that question before reaching the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (holding that Article III standing must be resolved before the merits); *see also Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) ("Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction."). A plaintiff "must demonstrate standing standing . . . for each form of relief that [he] seek[s]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

Where, as here, the relief sought is prospective, the plaintiff must show "a substantial likelihood that he will suffer injury in the future" to establish standing. *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999); *Murthy*, 603 U.S. at 58 ("[B]ecause the plaintiffs request forward-looking relief, they must face a real and immediate threat of repeated injury."). That threat "may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985). "[A]llegations of *possible* future injury are not sufficient." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1281 (11th Cir. 2024). Rather, the plaintiff must "demonstrate that future injury is *certainly impending*, or at the very least, that there is *substantial risk* that the harm will occur." *Id.* (cleaned up).

Past injury does not meet that standard on its own. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (cleaned up). Nor does a stated intention to engage in similar activity in the future, unless it is specific and concrete. *See Elend*, 471 F.3d at 1207–08 (holding protesters lacked standing for prospective relief where they did not identify when, where, or in what circumstances they would

protest again); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (holding "some day" intentions without "concrete plans" do not establish an imminent injury). And a threatened injury that depends on "a highly attenuated chain of possibilities" is not certainly impending. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Fishback cannot meet this standard.

Attempting to establish standing, Fishback relies on two facts: (1) his removal from the September 1 BCC meeting, and (2) his sworn intention to return to other BCC meetings and discuss similar topics. Mot. at 6–7, 11–12. Neither suffices. A past wrong matters only as "evidence bearing on whether there is a real and immediate threat of repeated injury," and Fishback's removal on September 1 predicts nothing about the injury he asks the Court to prevent. *Lyons*, 461 U.S. at 102 (cleaned up). As the recording of that meeting shows, Fishback was cut off only after it was abundantly clear that he was not speaking on Item 5(B), as required by the rules. Video at 2:08:55–2:09:49. In other words, Fishback has never been silenced while making the "reasonably related argument" he now asks the Court to protect. Mot. at 14–15.

That leaves only his intention to return to another BCC meeting. Fishback's theory is that he will return to the podium, give a germane argument that refers to the County's Israel-bond investments, and be silenced anyway. Mot. at 6–7, 11–12. The record rules out that possibility for four reasons. *First,* the Chairman stated the rule on the record, in plain terms, less than a minute before Fishback spoke: a speaker who addresses the item under consideration "can say as much" as he likes. Video at 2:07:53–2:08:06. He said so to a speaker who had raised the fear that he would be removed based on who he was rather than for what he said: "that's not the case. Let's not, let's not put words in anybody's mouth. You just have to follow the order and speak on the item." *Id.* at 2:07:30–2:08:47. When that speaker closed with "11(A)(2) is an absolute disgrace," his microphone was cut. *Id.* at 2:08:29–2:08:35. The rule thus worked exactly as the Chairman

described it. Fishback's assertion that the Chairman "has not disavowed the challenged conduct," Mot. at 2; *see id.* at 12, ignores the Chairman's statements, made before Fishback spoke, that a speaker would lose the floor by straying from Item 5(B).

*Second*, the rule was enforced exactly as announced. Three speakers at the meeting did what Fishback says he wants to do in the future: they argued that public money should be invested locally, criticized investment in foreign-government debt, including Israel's, and tied that argument to Item 5(B). Each finished without interruption. *See* Video at 1:58:59–1:59:52 (Carney), 2:04:23–2:05:33 (Vargas), 2:05:40–2:06:14 (Trachtenberg). Trachtenberg closed with "please divest from apartheid," and her microphone stayed on. *Id.* at 2:06:14. These speakers received exactly the treatment Fishback says he wants: they criticized foreign- government investments, including Israel's, as part of an argument about Item 5(B), and they were heard in full.

*Third*, the speech Fishback describes in the future is not the speech that got him removed. He now promises to speak "peacefully, within the allotted speaking time, and in a manner reasonably related to the pending agenda item." Mot. at 6–7. On September 1, he did not do the last of these. He disclaimed any intent to talk about Israel, talked only about Israel, never addressed Item 5(B), and kept talking after his microphone was cut and he was told his turn was over. *See* Video at 2:08:55–2:10:11. If Fishback does in the future what he says he will do, he will be treated like all the other speakers who were permitted to speak fully.

*Fourth*, the Chairman's ruling resulted from circumstances unique to the September 1 meeting, and Fishback points to no future agenda that would recreate this scenario. Specifically, speakers registered for a hospital-bond public hearing attempted to comment on a different resolution, Item 11(A)(2), which had passed earlier that day and whose public hearing had been held at committee seven weeks prior. Mot. at 4. Item 11(A)(2) is now done. And Fishback

identifies no pending item or scheduled agenda on which he intends to speak, only unspecified future meetings involving "any County bond, investment, budget, or financial-policy matter." Mot. at 6. The Eleventh Circuit rejected precisely this kind of open-ended intention in *Elend*, where protesters removed from one event sought to enjoin future removals based on their intent to "peacefully express their viewpoints in the future in a manner similar to" their past conduct. 471 F.3d at 1204 (cleaned up). Without a particular time, place, or manner, the court held, those allegations amounted to the "some day" intentions the Supreme Court forbids. *Id.* at 1207–08 (citing *Lujan*, 504 U.S. at 564). Fishback's claims track the *Elend* plaintiffs' nearly word for word, and his case is weaker still: the *Elend* plaintiffs at least wanted to repeat what they had already done, while Fishback asks the Court to protect speech he has never given.

To be harmed, then, Fishback must someday give a germane argument he has never given, and the presiding officer must respond to it in a way he has never responded. A "perhaps or maybe chance" like that is not enough. *Malowney*, 193 F.3d at 1347 (cleaned up). And finding otherwise would require the Court to predict that a County official will consistently act unconstitutionally in the future, the very prediction the Supreme Court declined to make in *Lyons*. 461 U.S. at 105–06 (holding that, to obtain prospective relief, the plaintiff would have had to show that officers always act unlawfully in the relevant circumstances or that the city authorized them to do so).

Perhaps in recognition of this problem, Fishback's own Complaint pleads prospective relief only conditionally. He seeks "declaratory and prospective relief to the extent supported by the facts established in discovery," Compl. ¶ 8, asks for an injunction only "[i]f prospective standing is established," *id.* ¶ 80, and prays for prospective relief only "if Fishback establishes Article III standing for that relief." *Id.* at 18. A plaintiff who can't even plead that he has standing for prospective relief certainly cannot make the "clear showing" that he is "likely" to establish

standing. *Murthy*, 603 U.S. at 58. Because Fishback asks this Court to protect speech he has never given—a germane argument on the item before the Board—he cannot show the real and immediate threat of future injury that prospective relief requires, which is fatal to his Motion.

## II. Fishback Cannot Establish a Substantial Likelihood of Success on the Merits.

Even if Fishback had standing to pursue prospective relief, he cannot establish a substantial likelihood of success on the merits, because all his claims are subject to dismissal. *See Keister*, 879 F.3d at 1287. The Eleventh Circuit has described this as "generally the most important" of the four factors. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005). As the MTD demonstrates, and the Video confirms, Fishback is unlikely to succeed on either of his substantive claims (Counts I or II).[3]

### A. Fishback Suffered No First Amendment Violation.

A county commission meeting is a limited public forum in which the presiding officer may confine speakers to the agenda item, so long as he does not discriminate based on viewpoint. *McDonough v. Garcia*, 116 F.4th 1319, 1323 (11th Cir. 2024) (en banc); *Jones v. Heyman*, 888 F.2d 1328, 1332–33 (11th Cir. 1989). Fishback concedes the Board could confine the hearing to Item 5(B). Compl. ¶ 7. And that is precisely what the Chairman did here, without regard to viewpoint. As the Video shows, speakers who criticized the Israel-bond investment policy while addressing Item 5(B) finished their remarks whereas speakers who abandoned Item 5(B) for Item 11(A)(2) lost the floor. *See* [ECF No. 17-5]. Fishback never addressed Item 5(B) at all. *See* Video

---

[3] Count III improperly pleads a request for declaratory and injunctive relief as a standalone cause of action. But an injunction is not a claim; it is a "remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed," and "if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005) (cleaned up). Because, as explained below, Fishback's substantive claims (Counts I and II) fail, so too does his request for declaratory and injunctive relief.

at 2:08:55–2:09:49. Ending his remarks was therefore a straightforward application of a germaneness rule Fishback concedes the First Amendment permits, ***not*** viewpoint discrimination. *See* Compl. ¶ 7. At most, Fishback disputes the Chairman's ruling that his remarks were off topic. But even if the Chairman got it wrong, "[a]n erroneous judgment call on the part of a presiding officer does not automatically give rise to liability for a constitutional tort." *Jones*, 888 F.2d at 1334. Without an underlying violation, every claim against the Chairman and the County fails. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

### B. Legislative and Qualified Immunity Bar Fishback's Claims Against Chairman Rodriguez.

Even if Fishback could establish a First Amendment violation, immunity would independently bar his claims against the Chairman. Beginning with legislative immunity, which bars the only relief the Motion seeks: an injunction against the Chairman in his official capacity. Mot. at 1, 14. Local legislators, like Chairman Rodriguez, are absolutely immune for their legislative acts, whatever their motive, *Bogan v. Scott-Harris*, 523 U.S. 44, 49, 54 (1998), and the immunity extends to official-capacity suits for prospective relief, *Scott v. Taylor*, 405 F.3d 1251, 1255 (11th Cir. 2005). Presiding over public comment on a pending resolution, which requires recognizing speakers, confining them to the agenda item, and removing those who refuse to yield, constitutes legislative activity. *See* MTD at 16–19, § II (collecting cases). Independently, qualified immunity bars Count I against the Chairman in his individual capacity because no clearly established law forbids a presiding officer from keeping speakers on topic. *See id*. at 14–16, § I.C. To the contrary, this Circuit has endorsed the very conduct at issue here: ending a speaker's remarks and having him removed from a public meeting after he strayed from the agenda. *See, e.g.*, *Jones*, 888 F.2d at 1332–33. Because immunity shields the Chairman from suit, Fishback cannot show a substantial likelihood of success on Count I.

### C. Fishback Has Not Plausibly Alleged an Unconstitutional County Policy.

Fishback's § 1983 claim against the County (Count II) fares no better. For starters, without an underlying constitutional violation, there can be no municipal liability. *See Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) ("[A]n inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred."). Beyond that, though, Fishback challenges no County rule or policy as unconstitutional; in fact, he concedes that the BCC's governing rules are valid. Compl. ¶ 7. Instead, he takes issue with how the Chairman applied those rules to him on September 1. *Id.* ¶¶ 50, 71–73. However, a single decision constitutes County policy only if it is made by an official with final policymaking authority. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). The Chairman is no such official as the County's policymaking authority rests with the 13-member Board as a whole. *See* Rule 5.03 [ECF No. 17-2 at 23]. Because Chairman Rodriguez did not have final decision-making authority, he cannot subject the County to municipal liability. And, to the extent Fishback is pursuing a ratification theory of *Monell* liability, that fails as well. He alleges that the commissioners present, who could have voted to let him continue speaking, somehow "ratified" the decision to have him cut off and removed. Compl. ¶ 72. But ratification requires the final policymaker to approve "not only the decision itself, but also the unconstitutional basis for it." *Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002). And all Fishback alleges is that the Board did nothing, which is not ***approval*** of a decision, much less of an unconstitutional basis for it.

## III. Fishback Cannot Establish Irreparable Harm, Requiring Denial of the Motion.

Even if Fishback established standing and a likelihood of success on the merits, "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Fishback must

show that in the absence of a preliminary injunction, "he will suffer irreparable injury." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975). The asserted irreparable injury "must be neither remote nor speculative, but actual and imminent." *Siegel*, 234 F.3d at 1176 (cleaned up). And this requirement "cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again." *Lyons*, 461 U.S. at 111.

Fishback cannot demonstrate a threat of continuing irreparable harm because every restriction he complains of ended on September 1. He was cut off and escorted out of one hearing, on one agenda item, that has since concluded. He does not challenge any rule, policy, or practice that remains in force. To the contrary, he concedes that the County's germaneness, time, and decorum rules are all valid. *See* Mot. at 2, 10. Accordingly, he remains free to address the Board on any item open for public comment. This defeats Fishback's reliance on *Elrod v. Burns*, 427 U.S. 347, 373 (1976), for the proposition that "the loss of First Amendment freedoms, even for a brief period, constitutes irreparable injury." Mot. at 11. *Elrod* does not presume irreparable harm every time a plaintiff invokes the First Amendment. The *Elrod* plurality found irreparable injury because the plaintiffs' First Amendment interests "were either threatened or in fact being impaired at the time relief was sought." 427 U.S. at 373. Consistent with that, the Eleventh Circuit has presumed irreparable injury only from an "on-going violation," and in the First Amendment context only where there is "an imminent likelihood that pure speech will be chilled or prevented altogether." *Siegel*, 234 F.3d at 1178; *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (vacating a preliminary injunction for failure to show irreparable harm, and explaining that an ongoing constitutional violation is presumed irreparable only in limited contexts, such as chilled speech, because those injuries cannot be undone by monetary remedies).

The cases Fishback cites to support his claim of irreparable harm fit that description, because each involved a restriction that remained in force and continued to impact the plaintiffs' speech. *See* Mot. at 11 (citing *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022) (finding the plaintiffs were entitled to an injunction involving university speech policies that applied to students' ongoing speech) and *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1301 (11th Cir. 2017) (affirming a preliminary injunction against enforcement of two city ordinances, then in force, restricting the plaintiffs' ongoing commercial solicitation)). By contrast, Fishback has no such ongoing restriction to point to here. He merely challenges one ruling, at one hearing, that is over. There is no ordinance, policy, or practice that is currently infringing on Fishback's First Amendment rights. The only rule in force is one he concedes is valid and promises to obey. *See* Mot. at 2, 6–7, 10; Compl. ¶ 7. A germaneness ruling that ended on September 1 is not an ongoing violation, and it cannot show irreparable harm.

What Fishback has alleged instead is a past injury, and the law already provides a remedy for it. An injury is irreparable "only if it cannot be undone through monetary remedies." *Ne. Fla. Chapter*, 896 F.2d at 1285. And "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Here, Fishback seeks compensatory, nominal, and punitive damages for his purported injuries pertaining to September 1. *See* Compl. at 18. Those remedies reach the past injury he alleges: compensatory damages for any actual harm, and nominal damages to vindicate the right itself, even if he proves no damages. *See Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003) ("Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages."); *Uzuegbunam v. Preczewski,* 592 U.S.

279, 293 (2021) (holding that nominal damages redress a past violation of a student's free-speech rights). Fishback's own argument proves this point. He submits that "[d]amages cannot restore a lost opportunity to address elected officials after the relevant meeting has concluded." Mot. at 12. But the only "lost opportunity" he identifies is the September 1 meeting, which has already ended and which no injunction can reach. Because Fishback faces no ongoing speech restriction and has an adequate remedy at law for his alleged injuries, he has not shown irreparable harm.

## IV. The Balance of Harms and the Public Interest Weigh Against an Unworkable Injunction That Would Place the Board's Meetings Under the Court's Supervision.

The final factors confirm what the others establish: Fishback's request for a preliminary injunction should be denied. When an injunction is sought against the government, the balance of harms and the public interest merge. *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1293 (11th Cir. 2021). Both weigh against the vague, open-ended injunction Fishback seeks here.

Every injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B)–(C). Because of the threat of contempt, an injunction must give the restrained party "fair notice of what conduct will risk contempt" and be "tailored to remedy the specific harms shown rather than to enjoin all possible breaches of the law." *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996) (cleaned up). The Eleventh Circuit has therefore rejected injunctions that "do no more than instruct the [defendant] to 'obey the law,'" *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999), and those that turn on inherently unclear terms, *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1185 (11th Cir. 2010) (reversing injunction requiring placement in a "comparable" position because of the term's "inherent lack of clarity").

Fishback seeks an injunction that fails to meet this standard. Specifically, he asks the Court to preclude the County from silencing or removing him when he "criticizes or refers to the

County's investment in bonds backed by the government of Israel, when that criticism or reference forms part of a reasonably related argument concerning a County bond, investment, budget, or financial-policy matter open for public comment." Mot. at 14–15. Whether a remark is "part of a reasonably related argument" is a standard "too vague to be understood," and it is "susceptible to debate, ambiguity, or misunderstanding." *Hunters Run Prop. Owners Ass'n v. Centerline Real Estate, LLC*, No. 18-80407, 2020 WL 14060429, at *17 (S.D. Fla. Mar. 23, 2020) (rejecting injunction requiring defendant to "otherwise maintain club membership in good standing"); *Williamson v. Ala. Dep't of Mental Health & Mental Retardation*, No. 19-00669, 2021 WL 10893800, at *3 (N.D. Ala. Mar. 19, 2021) (rejecting an injunction seeking a general prohibition on "retaliation" which is a term that is "neither specific nor enforceable."). Again, the Motion itself proves the point: Fishback swears that his September 1 remarks bore "a reasonable relationship to the subject of Item 5(B)," Mot. at 4–5, even though he never mentioned Item 5(B), and the Chairman concluded otherwise. In other words, whether a remark is "reasonably related" to an item is too vague a standard to give the parties fair notice of the conduct proscribed.

The practical consequences of the injunction Fishback seeks also cut against the public interest. Fishback asks the Court to police a nebulous standard, comment by comment, and with no yardstick by which the County could measure its compliance. Faced with being hauled back into court over any ruling Fishback disagrees with, the County would have little choice but to stop enforcing its rules against him altogether. Such an outcome would impair the County's ability to conduct orderly meetings and waste public resources. *See Sasso v. Milhollan*, 735 F. Supp. 1045, 1049 (S.D. Fla. 1990) (denying injunction in part because it would "jeopardize the orderly and efficient administration" of the law); *Democratic Senatorial Campaign Comm. v. Detzner*, 347 F. Supp. 3d 1033, 1039 (N.D. Fla. 2018) (citing the public interest in "uniform, definite rules").

With its poorly defined criteria, Fishback's injunction would have the Court act as a pseudo-chair of the BCC, taking on the role of legislator and arbiter of every BCC meeting Fishback attends. Courts do not grant injunctions "requiring detailed and continuous supervision over the conduct of a political subdivision." *Brown v. Bd. of Trs. of LaGrange Indep. Sch. Dist.*, 187 F.2d 20, 24 (5th Cir. 1951); *Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1121 (N.D. Ga. 2020) (declining to issue injunction that would require "detailed and continuous supervision over the conduct of" county's election board). Because the requested injunction would place the County's legislative process under continuing federal supervision, the balance of harms and public interest weigh decisively against it.

## V. No Evidentiary Hearing Is Necessary.

Finally, Fishback requests an evidentiary hearing under Local Rule 7.1(b)(2). *See* Mot. at 14. But "where material facts are not in dispute, . . . district courts generally need not hold an evidentiary hearing." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1313 (11th Cir. 1998). A hearing is required where the injunction turns on "bitterly disputed facts" that require the court to "decide credibility issues." *Id.* at 1312 (cleaned up). Here, the official recording captures everything Fishback says a hearing would show: "the complete context of [his] remarks," the Chairman's "repeated order to remove him," and whether there was any "material disruption" before that order. Mot. at 14; *see* Video at 1:55:54–2:20:55. And whether the conduct will recur is a legal question. *See supra* § I. Therefore, no hearing is needed.

## CONCLUSION

For the foregoing reasons, Defendant Anthony Rodriguez, in his official capacity as Chairman of the Miami-Dade County Commission, respectfully requests that Plaintiff's Motion for Preliminary Injunction [ECF No. 5] be denied.

Dated: October 6, 2026

Respectfully submitted,

**GERALDINE BONZON-KEENAN**
Miami-Dade County Attorney

By: <u>*/s/ Fabiana Cohen*</u>
Fabiana Cohen
E-mail: cohenf@miamidade.gov
Florida Bar No. 119732
Jennifer L. Hochstadt
E-mail: jennifer.azar@miamidade.gov
Florida Bar No. 56035
Assistant County Attorneys
Miami-Dade County Attorney's Office
Stephen P. Clark Center
111 N.W. First Street, Suite 2810
Miami, Florida 33128
Telephone: (305) 375-5151
Facsimile: (305) 375-5611
*Counsel for Defendants*